ACCEPTED
03-14-00501-CV
4238278
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/20/2015 4:53:19 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00501-CV

# In the Court of Appeals for the Third Judicial District at Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/20/2015 4:53:19 PM
JEFFREY D. KYLE
Clerk

THE COUNTY OF LA SALLE,
*Appellant*,

v.

JOE WEBER, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS DEPARTMENT OF TRANSPORTATION; TED HOUGHTON, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE TEXAS TRANSPORTATION COMMISSION; AND THE TEXAS DEPARTMENT OF TRANSPORTATION,
*Appellees*.

On Appeal from the
353rd Judicial District Court of Travis County, Texas

## APPELLEES' BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

SCOTT A. KELLER
Solicitor General

KRISTOFER S. MONSON
Assistant Solicitor General
State Bar No. 24037129

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1820
Fax: (512) 474-2697
*kristofer.monson@texasattorneygeneral.gov*

**Oral Argument Conditionally
Requested**

COUNSEL FOR APPELLEES

# TABLE OF CONTENTS

Table of Contents ................................................................................. i

Index of Authorities .............................................................................v

Statement Regarding Oral Argument ...................................................xiii

Issues Presented ..................................................................................xiv

Statement of Facts ............................................................................... 2

Summary of Argument.......................................................................... 8

Standard of Review ..............................................................................10

Argument.............................................................................................10

    I.     The County's *Ultra Vires* is Jurisdictionally Barred By Operation of Law ...........................................................................................10

        A.     An *Ultra Vires* Suit Cannot Be Used to Attack Either Past Administrative Action or the Application of an Administrative Rule. ............................................................ 11

            1.     An *ultra vires* claim cannot undo past action, because otherwise it would serve as a form of judicial review. ............................................................12

            2.     An *ultra vires* claim cannot be used to interfere with a statutory grant of discretion, such as an authorization to set policy through administrative rulemaking. .................................................................. 13

        B.     There is No Jurisdiction in this Case Because the Petition Complains About a Matter Confided to Executive-Department Discretion by SB 1747. .........................................14

i

1. The County's *ultra vires* allegations focus on an alleged failure to exclude certain counties from the allocation based on the purported omission of a factfinding proceeding from the application process................................................................14

2. SB 1747 gives the Department discretion to set the requirements for applications and suggests that counties determine whether they are "affected by" oil-and-gas production in the first instance....................15

3. SB 1747 does not require the Department to determine whether counties are in fact "affected by" oil-and-gas production; it requires the counties to make that determination. ...........................17

4. The non-discretionary provisions of SB 1747 encompass an award of funds to a county that has no oil-and-gas production at all. ...........................18

C. The County's Statutory-Construction Argument Is Wrong...................................................................19

1. The County's approach reads the words "affected by" out of SB 1747. ........................................19

2. Nothing in SB 1747's pre- and post-enactment legislative history changes the statutory analysis. ..........21

a. The pre-enactment versions of SB 1747 cannot change its plain language. ........................ 22

b. The post-enactment statements of legislators at most reflect their preference for statutory language the House passed, but that did not survive conference. ............................................. 24

ii

3.      The County's invocation of administrative deference makes no sense, given that the County seeks to avoid the procedural mechanisms in which that deference applies. ...................25

D.      The County Has a Judicial Remedy to Match its Legal Theory: a § 2001.038 Suit that Would, if Successful, Impact Future Allocations. ...................27

II.     The County's View of the *Ultra Vires* Cause of Action Ignores the Common Law and Would Create an Unconstitutional System for Reviewing Administrative Action...................28

A.      The County's Lawsuit Is, In Effect, An Improper Attempt to Seek Common-Law Judicial Review of Administrative Action. ...................29

B.      The County's Argument Improperly Takes the Form of the Relief it Seeks as the Basis for Establishing Jurisdiction Over the Substance of its Claim. ...................31

C.      The County's Reliance on Extrinsic Evidence Would Lead to a Constitutionally Defective System of Administrative Rule. ...................32

1.      The County seeks to invalidate the allocation based on extrinsic evidence...................33

2.      Even a statutory judicial-review mechanism based on this type of evidentiary inquiry would violate the Texas Constitution. ...................33

D.      While the County Would Be Entitled to Raise its Legal Arguments in a Properly-Pleaded § 2001.038 Claim, There is No Proper § 2001.038 Claim in this Appeal. ...................35

1.      Section 2001.038 is a waiver of sovereign immunity and must be so construed...................35

2.      The County's petition does not identify a "rule" .........37

iii

3.      The County's petition does not articulate a "right or privilege" necessary to establish standing or a waiver of immunity. ........................................38

4.      Even if the County's jurisdictional views were correct, its claim necessarily fails. ................................39

III.    The Court Should Not Issue an Appellate Injunction. ......................40

Prayer ..............................................................................................43

Certificate of Service.........................................................................44

Certificate of Compliance ..................................................................44

iv

## INDEX OF AUTHORITIES

**Cases**

*Bacon v. Tex. Historical Comm'n*,
411 S.W.3d 161 (Tex. App.—Austin 2013, no pet.) ......................... xiii, 11, 16

*Baird v. Sam Houston Elec. Coop*,
627 S.W.2d 732 (Tex. App.—Houston [1st Dist.] 1981)
(orig. proceeding) (per curiam) ................................................................. 42

*Butler Weldments Corp. v. Liberty Mut. Ins. Co.*,
3 S.W.3d 654 (Tex. App.—Austin 1999, no pet.) ........................................27

*Chem. Bank & Trust Co. v. Falkner*,
369 S.W.2d 427 (Tex. 1963) ......................................................................34

*City of Amarillo v. Hancock*,
150 Tex. 231, 239 S.W.2d 788 (1951)........................................................30

*City of El Paso v. Heinrich*,
284 S.W.3d 366 (Tex. 2009) ............................................................... 12, 32

*City of Houston v. Little Nell Apartments, L.P.*,
424 S.W.3d 640 (Tex. App.—Houston [14th Dist.] 2014,
pet. filed) ................................................................................................. 13

*City Pub. Serv. Bd. of San Antonio v. Pub. Util. Comm'n*,
96 S.W.3d 355 (Tex. App.—Austin 2002, no pet.)..................................36-37

*Combs v. City of Webster*,
311 S.W.3d 85 (Tex. App.—Austin 2009, pet. denied).....................12, 34, 37

*Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*,
307 S.W.3d 505 (Tex. App.—Austin 2010, no pet.) ........................ xiii, 11, 12

*Davis v. City of Lubbock*,
160 Tex. 38, 326 S.W.2d 699 (1959)................................................... 33, 34

*Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*,
  236 S.W.3d 190 (Tex. 2007)............................................21

*Entergy Gulf States, Inc. v. Summers*,
  282 S.W.3d 433 (Tex. 2009) ...........................................21

*Fire Dep't of City of Fort Worth v. City of Fort Worth*,
  147 Tex. 505, 217 S.W.2d 664 (1949) .....................................30, 33, 34

*Fleming Foods v. Rylander*,
  6 S.W.3d 278 (Tex. 1999)..............................................21

*Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*,
  96 S.W.3d 519 (Tex. App.—Austin 2002, pet. denied) .........................34, 39

*Gattis v. Duty*,
  349 S.W.3d 193 (Tex. App.—Austin 2011, no pet.).............................10

*Gen. Servs. Comm'n v. Little-Tex Insulation Co.*,
  39 S.W.3d 591 (Tex. 2001) ............................................11, 29, 30

*Gerst v. Nixon*,
  411 S.W.2d 350 (Tex. 1967) ...........................................34

*Gulf Land Co. v. Atl. Ref. Co.*,
  134 Tex. 59, 131 S.W.2d 73 (1939)......................................29

*Houston Mun. Emps. Pension Sys. v. Ferrell*,
  248 S.W.3d 151 (Tex. 2007) ...........................................30

*In re State Board for Educator Certification*,
  No. 13-0537, 2014 WL 7204548 (Tex. Dec. 19, 2014)
  (orig. proceeding) .................................................42

*Kerrville State Hosp. v. Clark*,
  923 S.W.2d 582 (Tex. 1996).............................................36

*Key W. Life Ins. Co. v. State Bd. of Ins.*,
  163 Tex. 11, 350 S.W.2d 839 (1961) .....................................33-34

*Livingston v. Beeman*,
408 S.W.3d 566 (Tex. App.—Austin 2013, pet. granted) ...........................32

*Lopez v. Harding*,
68 S.W.3d 78 (Tex. App.—Dallas 2001, no pet.) ........................................ 11

*Madison v. Martinez*,
42 S.W.2d 84 (Tex. Civ. App.—Dallas 1931, writ ref'd) ........................... 42

*McLane Co. v. Strayhorn*,
148 S.W.3d 644 (Tex. App.—Austin 2004, pet. denied).............................. 11

*Merritt v. Cannon*,
No. 03-10-00125-CV, 2010 WL 3377778 (Tex. App.—Austin 2010,
pet. denied) (mem. op.)............................................................................. 13

*Milton v. Herman*,
947 S.W.2d 737 (Tex. App.—Austin 1997) (orig. proceeding) ................... 11

*Mote Res. Inc. v. RR Comm'n*,
618 S.W.2d 877 (Tex. Civ. App.—Austin 1981, no writ) ............................ 41

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) (Scalia, J., dissenting)...................................................26

*Ojo v. Farmers Grp., Inc.*,
356 S.W.3d 421 (Tex. 2011) ....................................................................... 21

*Richardson v. First Nat'l Life Ins. Co.*,
419 S.W.2d 836 (Tex. 1967) ........................................................................10

*Rodriguez v. Serv. Lloyds Ins. Co.*,
997 S.W.2d 248 (Tex. 1999).........................................................................13

*RR Comm'n v. Tex. Citizens for a Safe Future and Clean Water*,
336 S.W.3d 619 (Tex. 2011).........................................................................26

*S. Canal Co. v. State Bd. of Water Eng'rs*,
159 Tex. 227, 318 S.W.2d 619 (1958)..........................................................34

*S.C. San Antonio, Inc. v. Tex. Dep't of Human Servs.*, 891 S.W.2d 773
(Tex. App.—Austin 1995, writ denied) ........................................27

*Slay v. Tex. Comm'n on Envtl. Quality*,
351 S.W.3d 532 ........................................................................ 27, 35

*State v. BP Amer. Prod. Co.*,
290 S.W.3d 345 (Tex. App.—Austin 2009, pet. denied) ...........38

*State v. Shumake*,
199 S.W.3d 279 (Tex. 2006) .....................................................21

*Tex. A&M Univ. Sys. v. Koseoglu*,
233 S.W.3d 835 (Tex. 2007) .....................................................10

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.*,
852 S.W.2d 440 (Tex. 1993) .....................................................10

*Tex. Comptroller of Pub. Accounts v. Walker Electric Co., LLC*,
No. 03-13-00285-CV, 2014 WL 6612431 (Tex. App.—Austin Nov.
21, 2014, reh'g filed) (mem. op.) ..............................................29

*Tex. Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) .....................................................10

*Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*,
145 S.W.3d 170 (Tex. 2004) .....................................................30

*Tex. Dep't of Pub. Safety v. Salazar*,
304 S.W.3d 896 (Tex. App.—Austin 2009, no pet.) ..................38

*Tex. Dep't of State Health Servs. v. Balquinta*,
429 S.W.3d 726 (Tex. App.—Austin 2014, pet. filed) ...............38

*Tex. Health & Human Servs. Comm'n v. El Paso Cnty. Hosp. Dist.*,
351 S.W.3d 460 (Tex. App.—Austin 2011), *aff'd* 400 S.W.3d 72
(Tex. 2013) ........................................................................ 33, 36

*Tex. Health Facilities Comm'n v. Charter Med.-Dallas., Inc.*,
665 S.W.2d 446 (Tex. 1984) ................................................31, 33

*Tex. Logos, L.P. v. Tex. Dep't of Transp.*,
241 S.W.3d 105 (Tex. App.—Austin 2007, no pet.) ....................................35

*Trudy's Tex. Star, Inc. v. City of Austin*,
207 S.W.3d 894 (Tex. App.—Austin 2010, no pet.)....................................18

*Wichita Falls State Hosp. v. Taylor*,
106 S.W.3d 692 (Tex. 2003) .....................................................................36

**Constitutional Provisions, Statutes and Rules**

TEX. CONST. art. II, § 1.................................................................................29-30

TEX. CONST. art. V § 6(a) .................................................................................. 42

43 TEX. ADMIN CODE

§ 15.182....................................................................................... 4
§ 15.184(a) ................................................................................... 4
§ 15.185....................................................................................... 4
§ 15.186(a) .................................................................................41
§ 15.187(b)(3) ............................................................................. 4
§ 15.189(a) ..................................................................................5
§ 15.189(b) ..................................................................................5
§ 15.191(a)...................................................................................5
§ 15.194......................................................................................41
§ 15.195......................................................................................5

TEX. GOV'T CODE § 311.034...........................................................................36

TEX. GOV'T CODE § 2001.038 .................................................................. *passim*

TEX. GOV'T CODE § 2001.038(a)...............................................................31, 37

TEX. GOV'T CODE § 2001.171 ..........................................................................14

TEX. GOV'T CODE § 2001.174............................................................................14

TEX. R. APP. P. 24.2(a)(3) ................................................................................ 42

TEX. SENATE RULE 7.12(b)(10) .............................................................. 22

TEX. TRANSP. CODE (SB 1747)

§ 222.1071..............................................................................................3
§ 222.1071(b) ..............................................................................xiv, 3, 17
§ 222.1071(c) ......................................................................................3
§ 222.1071(c)(l) ..................................................................................3
§ 251.103(a) ........................................................................................7
§ 256.101(2) ...................................................................................2, 20
§ 256.102 ..............................................................................................
§ 256.103............................................................................................ 15
§ 256.103(a) ...........................................xiv, 2, 4, 17, 18, 19, 22, 39
§ 256.103(b)................................................................................... 3, 18
§ 256.103(b)(1)...............................................................................8, 20
§ 256.103(b)(2) ...................................................................................3
§ 256.103(b)(24) ............................................................................... 20
§ 256.104(a)(1)..................................................................................... 2
§ 256.104(a)(2)(A)...............................................................................3
§ 256.104(a)(2)(B)(iii) .........................................................................3
§ 256.104(a)(2)(B)(iv) .........................................................................3
§ 256.104(b)........................................................................................ 15
§ 256.104(c)........................................................................................ 15
§ 256.105................................................................................................3

**Other Authorities**

Act of May 26, 2013, 83d Leg., R.S., c. 836 § 40, 2013 Tex. Gen. Laws 2163 ..........5

Am. Heritage Dictionary (4th ed. 1994) 29............................................19

Aman Batheja, Lawsuit Over Road Funding Program Leaves Funds in
    Limbo, Texas Tribune (May 15, 2014)....................................... 24

Garner, A Dictionary of Modern Legal Usage (2d ed. 1995) 34 .........................19-20

George D. Braden, *et. al*, The Constitution of the State of Texas;
    An Annotated and Comparative Analysis, vol. 1 (1977) ..............................34

Hearing, Select Committee on Transportation Funding, Expenditures & Finance, 83d Leg., R.S. (May 6, 2014) (5:46:18)............................25

House Alternative Bill, Tex SB 1747, 83rd Leg., R.S. (2013) (May 22, 2013).................................................................................25

Minute Order 113819, Tex. Transp. Comm'n Minutes at 7-8 (June 30, 2014) available at ftp.dot.state.tx.us/pub/txdot-info/adm/2014/0130/minutes.pdf................................................ 6

Minute Order 113819, Tex. Transp. Comm'n Minutes at 7-8 (June 30, 2014) available at ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/notification-013014.pdf................................ 6

Senate Bill, 1747. Act of May 26, 2013, 83d Leg., R.S., ch. 1372, 2013 Tex. Gen. Laws 3640 ...................................................... 2

Senate Research Center, Bill Analysis, SB 1747, 83d Leg. R.S. (2013) (enrolled version).................................................................23

Senate Research Center, Bill Analysis, SB 1747, 83d Leg. R.S. (2013) (filed version)...............................................................22-23

Testimony of La Salle County Judge, Hearings on Tex. S.B. 1747 Before the House Comm. On Energy Res., 83d Leg., R.S........................23

Testimony of Senator Uresti, Hearings on Tex. SB 1747 Before the Senate Comm. on Transp., 83d Leg., R.S. at 01:35:44 (Apr.10, 2013).................................................................................23

Tex. Transp. Commission Minutes at 3701-71 (Nov. 2013), available at http://ftp.dot.state.tx.us/pub/txdot-info/adm/2013/documents/minutes/112113.pdf ........................................5

TxDOT Notification: Notice of request for Applications for County Transportation Infrastructure Fund Grant Program, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/notification-112613.pdf .............................................................. 6

TxDOT, Estimated Allocation Chart, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/estimated-vs-actual.pdf.................................................. 6

TxDOT, Revised Notification, Revised Notice of Request for Application for County Transportation Infrastructure Grant Fund, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/estimated-vs-actual.pdf ................................................................................................ 6

Senate Research Website, www.senate.state.tx.us/SRC/BA.htm ......................... 22

**STATEMENT REGARDING ORAL ARGUMENT**

Oral argument is not warranted. The case law governing dismissal of putative *ultra vires* claims that attempt to challenge the result of executive-department action that would be subject to APA judicial review—if it were subject to judicial review at all—is well established. *E.g.*, *Bacon v. Tex. Historical Comm'n*, 411 S.W.3d 161, 180 (Tex. App.—Austin 2013, no pet.); *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 517-18 (Tex. App.—Austin 2010, no pet.). However, in the event the Court grants argument, the Department requests permission to present.

## ISSUES PRESENTED

The Texas Department of Transportation distributes funds to counties that are "affected by increased oil and gas production." *E.g.*, TEX. TRANSP. CODE § 256.103(a). The Department has express authority to regulate the application process and set standards for applications. It has no authority, by contrast, to make an independent determination that a county is so affected; instead, the relevant statutes state that it is *the counties* that determine whether each county is "affected because of oil and gas exploration and production activities" and "would benefit from funding [under the program.]" *Id.* § 222.1071(b). The County of La Salle asserts that the defendant officials have acted *ultra vires* by allocating money to all the counties that made valid applications.

1.      The common law bars suits for judicial review based on statutory language, and the Legislature has provided for neither a formal administrative proceeding nor judicial review of the Department's allocation of funding. Can the County circumvent the common-law prohibition on suits for judicial review by framing its lawsuit as a challenge to the results of the allocation?

2.      Is the County's *ultra vires* claim barred because the Department has acted *intra vires*?

3.      Has the County satisfied the pleading requirements to bring suit under § 2001.038 of the Government Code?

4.      Should an appellate writ of injunction issue to suspend a statewide road funding program?

No. 03-14-00501-CV

# In the Court of Appeals
# for the Third Judicial District
# at Austin, Texas

THE COUNTY OF LA SALLE,
*Appellant*,

v.

JOE WEBER, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS
DEPARTMENT OF TRANSPORTATION; TED HOUGHTON, IN HIS OFFICIAL CAPACITY
AS CHAIRMAN OF THE TEXAS TRANSPORTATION COMMISSION; ET AL.,
*Appellees.*

On Appeal from the
353rd Judicial District Court of Travis County, Texas

**APPELLEES' BRIEF**

TO THE HONORABLE THIRD COURT OF APPEALS:

Ignoring the discretion granting language in the statute, the County frames an *ultra vires* claim on the *results* of the allocation. SB 1747 gives the Department full discretion over the application requirements and process, and the County does not suggest that the Department did not properly allocate funds between the counties that filed applications. In effect, the County's legal theory would comprise common-law judicial review in the absence of statutory authority. The County's erroneous approach would create an end run around the common law, vitiate the APA's

procedural requirements by creating a common-law alternative, and raise serious separation-of-powers concerns. The Court should affirm the trial court's dismissal of the lawsuit.

STATEMENT OF FACTS

**1.    SB 1747 and the Transportation Infrastructure Fund Grant Program**

This lawsuit stems from the Department's application of the administrative rules implementing the Transportation Infrastructure Fund, created in 2013 by Senate Bill 1747. Act of May 26, 2013, 83d Leg., R.S., ch. 1372, 2013 Tex. Gen. Laws 3640. This brief will cite to the codified provisions in the current Transportation Code.

Senate Bill 1747 sets up a fund—to be funded from multiple sources outside of state general revenue—dedicated to "grants . . . for transportation infrastructure projects located in areas of the state affected by increased oil and gas production." TEX. TRANSP. CODE § 256.103(a); *see also id.* § 256.102 (listing sources of funding). Eligible projects include the planning, construction, and maintenance of transportation infrastructure "intended to alleviate degradation caused by the exploration, development, or production of oil or gas." *Id.* § 256.101(2).

➢ *County Eligibility*

A county seeking funding must file the previous year's road condition report, *see id.* § 256.104(a)(1), as well as a document establishing a County Energy

2

Transportation Reinvestment Zone, *id.* § 256.104(a)(2)(A), and a plan setting out the projects to be funded, along with the commitment of matching funds, *see id.* § 256.104(a)(2)(B)(iii) (referring to TEX. TRANSP. CODE § 256.105). The plan may also be subject to "any other requirements imposed by the department." *Id.* § 256.104(a)(2)(B)(iv).

The requirement of a County Energy Transportation Reinvestment Zone invokes a separate Transportation Code section, § 222.1071. *See* TEX. TRANSP. CODE § 222.1071. To establish a zone, a county commissioner's court must determine that an area is affected because of oil-and-gas exploration and production activities and would benefit from funding under Chapter 256. *Id.* § 222.1071(b) ("A county, after determining that an area is affected because of oil and gas exploration and production activities and would benefit from funding . . ."). The county must dedicate the captured appraised value of real property located in the zone to future transportation infrastructure projects.[1] *Id.* § 222.1071(c). There is no requirement in SB 1747 that any other body determine whether the county is affected.

➢ *Statutory Allocation Requirements*

The statute sets a specific allocation formula. *See id.* § 256.103(b) (allotting 20 percent of the amount to weight-tolerance permits, 20 percent according to oil-and-

---

[1] "Captured appraised value of real property," *see* TEX. TRANSP. CODE § 222.1071(c)(l), is related to future increases in tax funds in the affected zones, *see id.* § 256.103(b)(2).

gas-production taxes, 50 percent according to well completions, and 10 percent according to oil-and-gas injection rates). The first of these categories, weight-tolerance permits, is tied to increased road usage but is not directly tied to oil-and-gas production.

➢ *Administrative Rules*

The Department has statutory authority to adopt implementing rules for the program, as well as to impose additional requirements on the "plan" required in the application. TEX. TRANSP. CODE § 256.103(a).

In large part, the rules track the statute. The rules specify that grant funds will be available "to each eligible county that submits a valid application." 43 TEX. ADMIN. CODE § 15.184(a). To be eligible, a county must "be entirely or partially in an area affected by increased oil and gas production," create a tax-recapture zone, and create and advisory board to administer the zone. *Id.* § 15.182. The rules flesh out the calculations for determining the weighted distribution of funds. *Id.* § 15.185. The rules make the award of funding mandatory to each eligible county that submits a valid application. *Id.* § 15.184(a).

The application process is set for a particular time period and requires that the Department give notice of the estimated total amount of money available for grants and the estimated allocation "for each county in the state . . . using the assumption that all counties will be eligible and apply." *Id.* § 15.187(b)(3). The Department is to

perform two reviews of the applications: a preliminary review in the first 14 days after the application is received, which allows the applicant county 14 days to fix any deficiencies in the application, *see id.* § 15.189(a), followed by a "Department review" of "each valid application," *id.* § 15.189(b). Consistent with the statute, there is no provision for judicial review of the allocation or the application process.

Once the allocation is made, each county must enter into an agreement with the Department, placing restrictions on the granted funds. *See id.* § 15.191(a) (requiring, in essence, that any projects will be part of the county road system, limit the grant to allowable costs, and maintain the road in the future, and that the Department be reimbursed for its expenses in any project).

The rules set out debarment standards for counties, if they fail to comply with the rules or if they fail to commence a project within three-years after the date of the agreement under § 15.191(a). *Id.* § 15.195.

## 2. The Dispute

The dispute arises from the allocation of $225 million dollars appropriated in 2013 to be distributed to the applicant counties.[2] On November 21, 2013, the grant application deadline was set for February 7-14, 2014.[3] *See* CR.169-170. The

---

[2] *See* Act of May 26, 2013, 83d Leg., R.S., c. 836 § 40, 2013 Tex. Gen. Laws 2163, 2171.

[3] *See* Tex. Transp. Commission Minutes at 3701-71 (Nov. 2013), available at http://ftp.dot.state.tx.us/pub/txdot-info/adm/2013/documents/minutes/112113.pdf.

Department sent each county judge a notice that they could apply for funding and included an estimated allocation for each county in the state.[4] The original estimated allocation for La Salle County was $5,961,191.00.[5] *See* CR.222. The application deadline was then delayed a month, and a similar revised notice was sent out to the county judges.[6] *See* CR.170-71.

During the revised period, La Salle County applied for $158,507,765.00, nearly 70% of the total amount allocated to the fund.[7] It was awarded $6,456,703.00. PX38 p.2.

The County brought suit against the Department, its Executive Director, and the Chairman and Commissioners of the Texas Transportation Commission.[8] *E.g.*, CR.162 (collectively "the Department"). It sought declaratory and injunctive relief

---

[4] TxDOT Notification: Notice of request for Applications for County Transportation Infrastructure Fund Grant Program, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/notification-112613.pdf (indicating that the estimate "assumes all 254 counties will be eligible and apply").

[5] TxDOT, Estimated Allocation Chart, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/estimated-vs-actual.pdf.

[6] Minute Order 113819, Tex. Transp. Comm'n Minutes at 7-8 (June 30, 2014) available at ftp.dot.state.tx.us/pub/txdot-info/adm/2014/0130/minutes.pdf; *see also* ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/notification-013014.pdf.

[7] TxDOT, Revised Notification, Revised Notice of Request for Application for County Transportation Infrastructure Grant Fund, ftp.dot.state.tx.us/pub/txdot-info/energy/sb1747/estimated-vs-actual.pdf.

[8] The Transportation Commission is the body that adopts rules for the Department of Transportation.

based on the "Legislature's very specific mandate for determining county eligibility" for the funding. *Id.* It characterized the language in § 251.103(a) as imposing a bar on the Department's discretion to allocate funding. It described the supposed violation of law to be enjoined as the failure to make an "effort to ensure such eligibility." *E.g.*, CR.166 n.5. The County complained that by including all Texas counties in the initial allocation estimate, there was "no indication that [the Department] has applied this rule or the underlying statute" to "actually determine county eligibility," CR.170 ¶ 28; *see also* CR.171 ¶ 30 (the Department has "made statements to the effect that it has no authority . . . to determine whether a county's road condition report is sufficient"); CR.171-72 ¶ 33 ("TxDOT pressed forward without filtering out applications").

The County sought to enjoin the Department from dispersing the grants without first completing a new application process. CR.175-76 ¶ 44. It sought declaratory relief that the "actions of the Official Defendants" are "non-compliant with the properly construed statutes and valid rules, if any, governing the TIF grant program." CR.176 ¶ 46. The County cited § 2001.038 of the Government Code, asking the court, in the alternative, to declare "any TxDOT rules invalid to the extent that they depart from the statute." CR. 177 ¶ 47. And it sought fees under the Uniform Declaratory Judgments Act. CR.177 ¶ 48.

The Department filed a plea to the jurisdiction, arguing that (1) the Department is neither required nor authorized to perform a factfinding process with

7

regard to the applications, (2) the *ultra vires* claim was inappropriate, and (3) the petition failed to invoke jurisdiction over the § 2001.038 claim because it did not specify a rule that it challenged. *See* CR.134-37; CR.217-37

The trial court granted the Department's plea to the jurisdiction. CR.335.

SUMMARY OF ARGUMENT

The County's main statutory-construction argument is simply wrong. The plain text of SB 1747 does not require a county to show that it has oil and gas production within its territory; rather, it requires merely that the county be "affected" by increased oil and gas production. Even a county that is not experiencing increased oil and gas production can receive funding based on the number of heavy-load permits it issues. TEX. TRANSP. CODE § 256.103(b)(1). That approach makes sense, because a county may be traversed by heavy equipment for oil and gas production even if there is no oil-and-gas activity within its boundaries. Such a county is "affected by" oil and gas production.

The Court need not directly address that question, though, because the Department has been given discretion under SB 1747 to administer the grant funds and determine whether to treat the applications tendered by the counties as complete. The Department's acts have all, therefore, been *intra vires*. The entirety of SB 1747 underscores the grant of discretion over the application process, because it places the decision of how to handle the applications in the Department's hands and authorizes the adoption of administrative rules to effectuate that process. SB

8

1747 does not require the Department to investigate the truth of each application, or to engage in a fact-finding process. Indeed, the Legislature provided neither time nor resources to perform that task. SB 1747's only mention of a decision whether a county is affected by oil and gas production makes that determination one for *the county* to make. And even the portion of SB 1747 that is non-discretionary, the allocation formula (which the County does not argue that the Department violated), contemplates the award of funds to counties that have no oil-and-gas activity, because it allows awards based on the number of heavy use permits issued. In sum, because the Department is not required to establish the truth of applications and the County does not assert that the Department failed to apply the mandatory allocation provisions of SB 1747, there is not even an arguable basis for an *ultra vires* claim.

The bar on *ultra vires* claims does not leave the County without a forum in which to raise its arguments about the implementation of SB 1747. There could be jurisdiction over a suit to challenge *the rule* under § 2001.038 of the APA, or a claim within the scope of the inherent-review power, two causes of action on which the County does not attempt to base jurisdiction. But that new lawsuit could affect only future allocations; to reach back in time and undo the Department's acceptance of the applications would be an act of judicial review in the absence of statutory authorization. And the Texas Supreme Court has repeatedly made clear that there is no such thing as common-law judicial review of past executive-department action. Accordingly, the trial court correctly dismissed the lawsuit.

**STANDARD OF REVIEW**

A plaintiff must demonstrate that the allegations in his petition fall within the court's jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (citing *Richardson v. First Nat'l Life Ins. Co.*, 419 S.W.2d 836, 839 (Tex. 1967)). A defendant's plea to the jurisdiction based on sovereign immunity is analyzed in two steps: (1) examining the plaintiff's petition to see if it articulates a claim within the scope of a valid waiver of immunity and (2) determining whether undisputed evidence of jurisdictional facts negates the trial court's jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). The legal question whether the alleged facts invoke an exception to immunity can require an inquiry into the merits of the claim; conclusory legal allegations are insufficient, without supporting facts, to establish jurisdiction. *E.g.*, *Gattis v. Duty*, 349 S.W.3d 193, 201 (Tex. App.—Austin 2011, no pet.)  If either the pleadings themselves or the evidence affirmatively negates jurisdiction over the claim, the claim must be dismissed. *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 847 (Tex. 2007).

**ARGUMENT**

**I.    THE COUNTY'S ULTRA VIRES IS JURISDICTIONALLY BARRED BY OPERATION OF LAW.**

The County asks the wrong question in its *ultra vires* claim: it asks the Court to stop future disbursement of funds. But its substantive arguments are all tied to alleged defects in the vetting and acceptance of applications, all of which occurred in

the past and discretion over which is placed squarely with the Department. This lawsuit is an attempt to bypass the bar on common-law judicial review to undo an action—the acceptance of formally valid applications at face value—that was fully within the grant of discretionary authority made by SB 1747.

### A. An *Ultra Vires* Suit Cannot Be Used to Attack Either Past Administrative Action or the Application of an Administrative Rule.

As the Court has repeatedly held, an *ultra vires* claim is barred if it involves an issue committed to an agency's discretion. *E.g.*, *Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envt'l Qual.*, 307 S.W.3d 505, 517-18 (Tex. App.—Austin 2010, no pet.) (when statute places decision in defendant's hands without providing for judicial review, no *ultra vires* claim allowed); *Bacon v. Tex. Historical Comm'n*, 411 S.W.3d 161, 180 (Tex. App.—Austin 2013, no pet.) (same); *see also McLane Co. v. Strayhorn*, 148 S.W.3d 644, 650 (Tex. App.—Austin 2004, pet. denied) (dismissing claim because statute "clearly gave the Comptroller the authority and responsibility to manage and administer [a lump sum fund], including the authority to decide what collateral to accept").[9] This approach makes sense for two reasons: (1) the *ultra vires*

---

[9] A careful line should be drawn between the *ultra vires* cause of action, which is a common-law proceeding that allows courts to enjoin *ultra vires* activity, and the inherent right of judicial review of past acts on constitutional grounds. *See Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001) (setting out categories of inherent judicial review). For clarity, this brief will refer to the *ultra vires* claim as deriving from common law, and judicial review as being inherent under the Constitution. *See, e.g.*, *Lopez v. Harding*, 68 S.W.3d 78, 81 (Tex. App.—Dallas 2001, no pet.) (correctly distinguishing between common-law and inherent powers); *Milton v. Herman*, 947 S.W.2d 737, 739 (Tex. App.—Austin 1997) (orig. proceeding) (pointing out that

11

cause of action cannot be used to undo a past decision conferred on an executive-department entity because there is a bar on common-law review of administrative decisions; (2) there cannot be an *ultra vires* claim if a defendant entity has complied with its own administrative rules, because those rules are themselves a source of legal authority.

### 1. An *ultra vires* claim cannot undo past action, because otherwise it would serve as a form of judicial review.

An *ultra vires* claim must not address past action. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 375-78 (Tex. 2009). Otherwise, it would violate the prohibition on common-law judicial review and extend the scope of the courts' narrow inherent power of judicial review. *E.g.*, *Combs v. City of Webster*, 311 S.W.3d 85, 99 (Tex. App.—Austin 2009, pet. denied) (dismissing *ultra vires* claim that sought to undo tax determination and reallocate tax funds already collected and distributed). Thus, it is appropriate to bring suit to affect future, discrete payments based on a statutory scheme that does not require a particular administrative determination. *E.g.*, *id.* at 100-101 (performing *ultra vires* analysis based on future allocation of funds not triggered by statutory grant of decision-making authority); *Heinrich*, 284 S.W.3d 366, 377-78 (remanding, because case resolved on factual dispute regarding underlying legal obligation, but parties did not dispute meaning of statute). But it is

---

statutory courts lack inherent constitutional authority); *cf. Creedmoor-Maha*, 307 S.W.3d at 518 (describing common-law *ultra vires* claim as "inherent").

not appropriate to perform the *ultra vires* inquiry when assessing the results of a specific administrative determination intended to be performed by an executive-department entity. *E.g.*, *Merritt v. Cannon*, No. 03-10-00125-CV, 2010 WL 3377778, at *3-*4 (Tex. App.—Austin 2010, pet. denied) (mem. op.) (correctly concluding that *ultra vires* claim for failure to enforce statute was jurisdictionally barred because there was no basis for judicial review of predicate finding made by Department under specific statutory authorization); *see also City of Houston v. Little Nell Apartments, L.P.*, 424 S.W.3d 640, 654 & n.19 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) (correctly distinguishing *Merritt* on ground that Transportation Code gave Department specific authority to make predicate decision).

> **2. An *ultra vires* claim cannot be used to interfere with a statutory grant of discretion, such as an authorization to set policy through administrative rulemaking.**

An *ultra vires* claim must be dismissed if the defendant official is acting under a grant of discretion.[10] It will generally be true that, when an agency is authorized to proceed through rulemaking, it is exercising discretion to implement the statute. Administrative rules have the force of statutes. *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Both the process of adopting administrative rules and

---

[10] *Ultra vires* claims must be brought against officials. To the extent the live petition seeks *ultra vires* relief against state *entities*, those claims must be dismissed. To the extent the petition seeks to invoke jurisdiction under § 2001.038 of the Government Code, it fails to do so, and the claims that could be brought against the entities should, likewise, be dismissed.

the process of implementing them through contested-case proceedings are governed by specific statutory remedies, tied to the statutory nature of rulemaking and contested-case power. *See* TEX. GOV'T CODE §§ 2001.038, 2001.171, .174.

Accordingly, if a defendant's actions do not contravene an administrative rule, the suit is one for judicial review of the application of the rule, not a proper *ultra vires* claim.

**B.      There is No Jurisdiction in this Case Because the Petition Complains About a Matter Confided to Executive-Department Discretion by SB 1747.**

This Court's precedent is clear: if a matter is conferred to agency discretion, and the Legislature has not provided a contested-case proceeding or otherwise subjected the determination to judicial review, there can be no *ultra vires* claim. The test is whether the statute in question places the challenged determination within the defendant's discretion.

**1.      The County's *ultra vires* allegations focus on an alleged failure to exclude certain counties from the allocation based on the purported omission of a factfinding proceeding from the application process.**

The County's brief focuses on three supposedly *ultra vires* acts: failure to exclude counties not "located in an area of the state affected by increased oil-and-gas production," failure to exclude counties that failed to provide a substantively accurate road-condition report, and failure to exclude counties that did not create a reinvestment zone. Appellant's Br. at 30. The live petition, by contrast, seeks to

14

enjoin the countersigning of contracts to disburse funding with counties the court determines to be ineligible. CR.270-71 ¶ 44. The set of actions emphasized in the brief is barred because SB 1747 gives the Department discretion to set the requirements for and accept county applications. And the County's request for an injunction betrays that its real goal is a separate, judicial determination of whether each county is eligible to receive funding, a claim that amounts to a request for common-law judicial review.

> **2.** **SB 1747 gives the Department discretion to set the requirements for applications and suggests that counties determine whether they are "affected by" oil-and-gas production in the first instance.**

Acceptance of applications is within the Department's express discretion to "administer" the program. SB 1747 says that the Department shall administer the grant program and allocate the money between counties according to a particular distribution formula. TEX. TRANSP. CODE § 256.103. It sets out requirements for making applications and provides that the Department shall "review[]" those applications, with a view to (1) finding additional sources of funding and (2) improving project efficiency. *Id.* § 256.104(b). This review is to be performed within 30 days, with one potential extension to 60 days. *Id.* § 256.104(c).

Far from suggesting that the Department may not allocate funds without first conducting a fact-finding inquiry, this statutory framework suggests that the Department is not intended to conduct such an inquiry. SB 1747 contemplates the

processing of a large volume of applications in a maximum of sixty days, without providing time or resources for fact finding. As confirmed by defendant's exhibit 1, which gathers together all the applications, there is a lot of information to be reviewed within 60 days. See DX1. SB 1747 does not authorize contested case proceedings, nor does it instruct the Department to verify the contents of the applications using other information. And, aside from the descriptions of the application contents, there is no statutory language requiring that the Department perform any review, or apply any particular standard to the applications. Usually, when the Legislature intends the executive department to perform quasi-judicial actions, it imposes a particular standard of review. *See Bacon*, 411 S.W.3d at 180 & n.29 (pointing out that factfinding is usually achieved through contested-case proceedings, which must be provided for by statute). The text of SB 1747 confirms that the grant of authority to "administer" the program necessarily includes authority to accept formally sufficient applications from the counties as true.

SB 1747 contemplates a review of the formal requirements for making an application under Department rules specifying the contents of such applications. The Department comported with this requirement. The implementation of a rule setting out the formal requirements to apply for funding is precisely the type of discretionary activity regarding which the Court has disallowed *ultra vires* challenges. *E.g.*, *Bacon*, 411 S.W.3d at 180.

**3.** **SB 1747 does not require the Department to determine whether counties are in fact "affected by" oil-and-gas production; it requires the counties to make that determination.**

The County's request for injunctive relief hangs from the hook of § 256.103(a)'s statement that recipient counties must be affected by increased oil-and-gas production. By arguing that courts can use evidence extrinsic to the application process to make a separate determination that various counties were insufficiently "affected", the County in substance asks the Court to make a separate judicial determination of which counties are affected by oil and gas production.

Such an inquiry would be constitutionally problematic. *See infra*, Part II. But the Court need not venture into such unsafe waters because SB 1747's grant of discretion does not limit the Department's ability to include counties that have complied with the application process from an allocation of funds.

Nor does SB 1747 suggest that the Department's authority to administer the fund involves a separate authority to determine whether the various counties are "affected" by oil and gas production. To the contrary, SB 1747 indicates that decision is to be made by the counties. TEX. TRANSP. CODE § 222.1071(b) ("A county, after determining that an area is affected because of oil and gas exploration and production activities and would benefit from funding . . ."). Taken together with the lack of a grant of factfinding power and the two-month deadline for incorporating the information from all of the applications into the final allocation, this confirms the

Legislature's intent to place the administration of the program in the Department's discretion, while not creating a judicially-enforceable test for inclusion in the program based on the presence of increased oil-and-gas production in the county.

> **4.    The non-discretionary provisions of SB 1747 encompass an award of funds to a county that has no oil-and-gas production at all.**

If there were any question that the allocation formula could be complied with while including counties that do not meet the County's proposed standard for being "affected by" oil and gas production, the allocation provision makes clear that the Legislature authorized the resulting allocation. The allocation framework in § 256.103(b) is written in non-discretionary language. That provision should not be the basis of an *ultra vires* claim, even if the Department mistakenly failed to meet its requirements, *see Trudy's Tex. Star, Inc. v. City of Austin*, 207 S.W.3d 894, 906 (Tex. App.—Austin 2010, no pet.) (confirming that *ultra vires* claim is limited in scope, allows government entities to make mistakes without becoming subject to suit). In any event, the County does not argue that the Department failed to apply the correct allocation formula and the Court need not address the more difficult issue.

The County's primary argument is that, because § 256.103(a) says "increased oil and gas production," the applications had to establish the existence of increased oil and gas production. That analysis is wrong as a textual matter; even counties with no oil and gas production in their boundaries can be *affected by* oil and gas production

elsewhere, including through road damage from the heavy vehicles and machinery commonly used in the industry. It is also irrelevant. The County's key assertion is that the Department should have discarded some of the applications because their contents could be disproven. Yet the County cannot establish that there was a defect in the application process. Because the only acts about which the County actually complains are tied to the application process, the ultimate allocation cannot be used to reverse-engineer a procedural defect in the application process.

### C. The County's Statutory-Construction Argument Is Wrong.

The keystone of the County's statutory-construction argument is that, to receive funding, a county must be experiencing "increased" oil-and-gas production within its territory. Appellant's Br. at 16 (putting the word "increased" in bold), 19 (arguing that this language renders portions of § 256.103(a) surplusage).

#### 1. The County's approach reads the words "affected by" out of SB 1747.

The County never deals with the words "affected by" in § 256.103(a) and throughout SB 1747. A county can be "affected by" increased oil-and-gas production even if it is not experiencing increased production within its boundaries. To "affect" something is "to have an influence on or effect a change in." AM. HERITAGE DICTIONARY (4th ed. 1994) 29; *see also* GARNER, A DICTIONARY OF MODERN LEGAL

USAGE (2d ed. 1995) 34 ("to influence; to have an effect on").[11] Increased oil-and-gas production can, self-evidently, "have an effect on" neighboring counties, or counties through which oil and gas, or the equipment used to produce it, is transported.

The County points to in the statute that ties the availability of funding to the presence of increased oil-and-gas production. Instead, it highlights the word "increased" and implies from it that any funding must be tied to production. The statutory allocations belie that reading of the statute. Four of the allocation categories are pegged to oil-and-gas production rates. TEX. TRANSP. CODE § 256.103(b)(2-4) (pegging allocation to oil-and-gas production taxes, well completions, and volume of oil-and-gas waste injected). These provisions do not tie the allocation to an increase in oil and gas production, but merely to the relative rate of oil and gas production in the various counties. The remaining category, set out by § 256.103(b)(1) is not directly tied to oil-and-gas production rates, but rather to weight tolerance permits. *Id.* § 256.103(b)(1). This makes sense, because the equipment required to produce oil and gas may have to traverse other counties,

---

[11] The definition of "[t]ransportation infrastructure project" does not help the County either. *See* TEX. TRANSP. CODE § 256.101(2) (such projects are to "alleviate degradation caused by the exploration, development, or production of oil or gas"). Counties without oil-and-gas production or without increased oil-and-gas production may nonetheless be "affected" by increased production because oil-and-gas material is transported across them.

causing them to be "affected by" increased oil-and-gas production generally. The inclusion of § 256.103(b)(1)'s allocation of 20% of the funding confirms the Legislature's recognition that a county need not be experience an increase in oil-and-gas production to be "affected by" an increase in oil-and-gas production generally.

### 2. Nothing in SB 1747's pre- and post-enactment legislative history changes the statutory analysis.

Legislative history is disfavored in Texas, applying only to resolve ambiguities in statutory text. *E.g.*, *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 442-43 (Tex. 2009). The touchstone for legislative intent is the language adopted by the Legislature as a body, not the positions of individual legislators. *Id.* at 437 (citing *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)). While consideration of pre-enactment legislative history is permissible, it is not treated as dispositive in the face of statutory text. *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 195 & n.20 (Tex. 2007) (confirming principle announced by *Fleming Foods v. Rylander*, 6 S.W.3d 278, 283-84 (Tex. 1999)). Post-enactment history is even less useful, serving at most to highlight research into the Legislature's goals. *See Ojo v. Farmers Grp., Inc.,* 356 S.W.3d 421, 430-31 (Tex. 2011) (emphasizing result of study ordered when statute was enacted); *see also id.* at 436-37 (Jefferson, C.J., concurring) (pointing out that post-enactment history was not used to "construe" the statutory language).

### a. The pre-enactment versions of SB 1747 cannot change its plain language.

The County argues that the conference committee's resolution of inconsistencies between the House and Senate bills supports its view. Appellant's Br. at 24-26. The County characterizes the inclusion of § 256.103(a) as the adoption of the structure of the House bill, which would have focused on increased energy production. But the retention of a sentence from the House version of the bill is not particularly elucidating as to the effect of the SB 1747's plain text as enacted.

The County further relies on a Senate Research Center analysis for the proposition that SB 1747 was to target areas that had "suffered the most." Appellant's Br. at 26. It relies on that language far too much, as research center analysis is not legislative history regarding a bill's legal effect. A bill analysis does not manifest the Legislature's—or for that matter the committee's—intent as a body. It is not voted on. Rather, it includes a statement of the author's or sponsor's intent but is drafted by the Senate Research Center without legislative oversight.[12] The language on which the County relies is merely a statement of the sponsor's intent. And it is not, as the County suggests, an indication of the intent for the final version of the bill: the sponsor's statement is unchanged from the original research-center report. *Compare* Senate Research Center, Bill Analysis, SB 1747, 83d Leg. R.S.

---

[12] www.senate.state.tx.us/SRC/BA.htm; *see also* TEX. SENATE RULE 7.12(b)(10).

(2013) (filed version) (first paragraph of sponsor statement), *with* Senate Research Center, Bill Analysis, SB 1747, 83d Leg. R.S. (2013) (enrolled version) (identical text).

At any rate, that language does not necessarily support the County's position. That SB 1747 provides a long-term plan that will benefit areas with oil-and-gas production does not necessarily foreclose the possibility that funds will be available throughout the transportation system in recognition of the fact that the entire transportation network is stressed by increased oil-and-gas production.

Moreover, there is plenty of legislative history to suggest that the funding was extended state-wide as part of a compromise to gain passage. One Legislator focused on the fact that "nearly every county could stand to benefit." Testimony of Senator Uresti, Hearings on Tex. SB 1747 Before the Senate Comm. on Transp., 83d Leg., R.S. at 01:35:44 (Apr.10, 2013) (Appendix Tab A).[13] The La Salle County Judge was plainly aware at the time of the hearings that SB 1747 encompassed all 254 counties. Testimony of La Salle County Judge, Hearings on Tex. S.B. 1747 Before the House Comm. On Energy Res., 83d Leg., R.S. ("you have 254 counties that have to set up and to comply with your issues on your reports and projects.") (Appendix Tab A).

---

[13] *available at* http:/tlcsenate.granicus.com/MediaPlayer.php?view_id=9&clip_id=358, at 01:35:44 ("While today I highlight the explosive growth of the Eagle Ford Shale as an example of why this Bill is needed, it will not only apply to the Eagle Ford Shale. *Based on the matrix in this Bill nearly every county could stand to benefit . . .*").

These statements are consistent with Senator Uresti's post-enactment statements regarding the bill, which he portrays as a compromise: he had to make all counties eligible for funding in order to overcome entrenched opposition to appropriating state money to county road projects. Aman Batheja, *Lawsuit Over Road Funding Program Leaves Funds in Limbo*, Texas Tribune (May 15, 2014) ("Senator [Uresti] . . . believes [the Department] was following the law correctly. . . . the version [of SB 1747] that passed was changed to make more counties eligible for the funding.").[14]

In short, the County points to the sponsor's intent in the original bill. The Department has provided contemporaneous and post-legislative history from the sponsor indicating that the purpose of the bill changed over the course of enactment. To the extent that legislative history is relevant to this case, it ultimately favors the Department's position because the only evidence to support the County is tied to statements regarding the House version of the bill, rather than the text of SB 1747 as enacted following conference.

> **b.** **The post-enactment statements of legislators at most reflect their preference for statutory language the House passed, but that did not survive conference.**

The County also cites a colloquy at a post-enactment oversight hearing for the proposition that individual representatives believed SB 1747 would have a different

---

[14] *Available at* www.texastribune.org/2014/05/15/lawsuit-over-road-funding-program-leaves-funds-lim.

24

effect. *See* Appellant's Br. at 27-29 (discussing Hearing, Select Committee on Transportation Funding, Expenditures & Finance, 83d Leg., R.S. (May 6, 2014) (5:46:18)). This colloquy is merely the post-enactment statement of individual legislator's beliefs about a past-Legislature's actions. (And it appears to focus on the House version of the bill, which, the County points out, was more limited in scope. See Appellant's Br. at 25 (discussing House Alternative Bill, Tex SB 1747, 83rd Leg., R.S. (2013) (May 22, 2013))).

Complaints by members of a house committee about their intent for a bill is not a proper basis for using post-enactment history to understand the version of the bill generated by the conference committee and voted upon by the entire Legislature. Particularly when, in context, the post-enactment legislative history appears to be aimed at the version of the bill passed by that committee and that house of the Legislature, as opposed to the ultimate statutory language adopted by the Legislature after the conference process.

### 3. The County's invocation of administrative deference makes no sense, given that the County seeks to avoid the procedural mechanisms in which that deference applies.

The County suggests that the Department acted *ultra vires* to the portions of the rule that track the statute. Appellant's Br. at 22-23. Quixotically, the County labels this as an issue of agency deference. *Id.* at 22. That makes no sense. Administrative deference applies to an agency's interpretation of a statute in its own

25

rules. *E.g.*, *RR Comm'n v. Tex. Citizens for a Safe Future and Clean Water*, 336 S.W.3d 619, 625 (Tex. 2011) (upholding agency interpretation so long as construction "is reasonable and does not contradict the plain language of the statute" (citation omitted)). When deference occurs, a court chooses to leave an agency's resolution of statutory ambiguity in place, so that a subsequent administration is at liberty to reach the opposite result. *Id.*; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1018-19 & n. 14 (2005) (Scalia, J., dissenting) (highlighting distinction between accepting administrative body's interpretation of a statute and judicial construction of that statute).

What the County advocates is not deference, but rather judicially-imposed administrative sclerosis. The County's approach would frustrate the purpose of deference by locking one view of the statute in stone. And it would do so in a strange way. The rules for the most part track the statute, but the County seeks to use the tracking as a form of deference that precludes the Department and its officials from making an entire category of statutory-construction claim. It bases that argument on the presupposition that the rules should have prevented the Department from accepting certain applications without pointing to a provision in the rules that actually requires independent verification of the facts presented. The county's approach is deeply at odds with the administrative flexibility that is at the heart of the deference doctrine.

**D. The County Has a Judicial Remedy to Match its Legal Theory: a § 2001.038 Suit that Would, if Successful, Impact Future Allocations.**

That the County cannot bring an *ultra vires* claim based on the application of an administrative rule does not leave the County without a judicial forum in which to advance its legal theory that SB 1747 requires a separate administrative determination that the applications are accurate. It could bring suit under § 2001.038 of the APA, challenging the rule as invalid for failure to include a separate fact-finding procedure.

The remedy in such a suit would not encompass the allocation of the $225 million on which the County bases its complaint, because § 2001.038 does not apply to past applications of administrative rule and can result only in a declaratory judgment regarding the legal status of the rule itself. TEX. GOV'T CODE § 2001.038; *Slay v. Tex. Comm'n on Envtl. Quality*, 351 S.W.3d 532, 544-45 (properly explaining scope of § 2001.038 suit and relief). But the remedy in such a lawsuit would govern future allocations, assuming the County could otherwise satisfy the jurisdictional prerequisites for bringing suit within its waiver of immunity.[15] The Court need not

---

[15] Alternatively, inherent judicial review could, in theory, trigger a new allocation process. But the County has has not attempted to invoke the Court's inherent judicial-review power. And it is not clear that it could do so, given that an applicant for government funding does not have a vested property interest in receiving that funding. *E.g., Butler Weldments Corp. v. Liberty Mut. Ins. Co.*, 3 S.W.3d 654, 659-60 (Tex. App.—Austin 1999, no pet.); *S.C. San Antonio, Inc. v. Tex. Dep't of Human Servs.*, 891 S.W.2d 773, 778 (Tex. App.—Austin 1995, writ denied).

address the issue in this appeal, because the petition in effect disclaims any attempt to invoke § 2001.038's waiver of immunity from suit as construed in this Court's precedent. *See infra*, Part II.D.

## II. THE COUNTY'S VIEW OF THE *ULTRA VIRES* CAUSE OF ACTION IGNORES THE COMMON LAW AND WOULD CREATE AN UNCONSTITUTIONAL SYSTEM FOR REVIEWING ADMINISTRATIVE ACTION.

Because the County presumes that *ultra vires* jurisdiction is available to review the application of an administrative rule, in derogation of the common law and the Administrative Procedure Act, it does not fully articulate a theory of the *ultra vires* cause of action as a basis for judicial review of executive-department action. This is in part for good reason: any discussion of the case law would highlight the problems inherent in treating the *ultra vires* cause of action as a basis for common-law judicial review. *See supra*, Part I.A.

The necessary implications of the County's views are clear from its brief and pleadings. The County seeks to undo the acceptance of the applications, which would change the allocation calculations. And it seeks a judicial determination that certain counties are not "affected by" increased oil-and-gas production, based on extrinsic evidence and legislative history. This second request asks the Court to proceed based on the policy justifications for the County's view of SB 1747, rather than the statute's plain text and the Department's implementation of that text in the administrative rule.

In the County's view all this judicial activity is OK, because the remedy would be an injunction against distributing the money. Appellant's Br. at 31-32 (suggesting that the cause of action is available because the form of the remedy is appropriate).

It is not OK. The County flouts the common law, ignores the APA, and its approach would, if adopted, be unconstitutional under decades of Texas Supreme Court precedent governing the availability of judicial review of administrative actions.

## A.   The County's Lawsuit Is, In Effect, An Improper Attempt to Seek Common-Law Judicial Review of Administrative Action.

The allocation has already occurred, and disbursement of the $225 million at issue in this case is mandated by it. Because the County seeks to reach back in time and undo something the agency has already done, it is necessary to review how the common law and the judicial-review provisions of the APA interact.

There is no common-law right to judicial review of administrative actions unless the order adversely affects a vested property right or otherwise violates the Constitution. *Little-Tex*, 39 S.W.3d at 599; *see also, e.g.*, *Tex. Comptroller of Pub. Accounts v. Walker Electric Co., LLC*, No. 03-13-00285-CV, 2014 WL 6612431, at *4-*6 (Tex. App.—Austin Nov. 21, 2014, reh'g filed) (mem. op.) (recognizing that not every administrative action is subject to contested-case proceedings or judicial review). Accordingly, some executive-department actions are *unreviewable. Gulf Land Co. v. Atl. Ref. Co.*, 134 Tex. 59, 73-74, 131 S.W.2d 73, 82 (1939); TEX. CONST.

art. II, § 1. Any (non-constitutional) rights related to the form or substance of an administrative rule are created by the APA itself and are, therefore, entirely statutory. *E.g.*, *City of Amarillo v. Hancock*, 150 Tex. 231, 233, 239 S.W.2d 788, 790 (1951). The Legislature has the authority to provide a statutory right that has no judicial recourse at all, even though the courts must be able to hear constitutional claims. *E.g.*, *Houston Mun. Emps. Pension Sys. v. Ferrell*, 248 S.W.3d 151, 157-58 (Tex. 2007).

The *ultra vires* cause of action against defendant officials cannot be construed as a basis for reviewing application of administrative rules—otherwise, it would serve as the very grant of common-law judicial review that *Little-Tex* disclaims. *See supra*, Part I.A (collecting cases).

Nor does the APA provide for the general judicial review of administrative action the County seeks through its *ultra vires* claim. The APA maintains the common law's concern about balancing the respective roles of the judicial and executive departments. For example, the "substantial evidence" rule for agency contested-case determinations not only sets the parameters on a waiver of immunity from suit, *see Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004), but it embodies a pre-existing common-law standard framed to avoid separation-of-powers problems, *e.g.*, *Fire Dep't of City of Fort Worth v. City of Fort Worth*, 147 Tex. 505, 509-510, 217 S.W.2d 664, 666 (1949). The touchstone of this inquiry is that the court rules on the reasonableness of the body's

order, not its correctness. *E.g.*, *Tex. Health Facilities Comm'n v. Charter Med.-Dallas., Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). If courts were to do more—by resolving policy matters based on their own preferences—the administrative process would be rendered meaningless.

Likewise, § 2001.038 of the APA allows declaratory relief related to the "applicability" of an administrative rule, but not to that rule's *application*. *See* TEX. GOV'T CODE § 2001.038(a). Accordingly, a § 2001.038 claim cannot be used to undo past administrative action under an administrative rule.

The most important point, though, is that the APA's procedural requirements for judicial review go hand in hand with the legislative creation of administrative power and the limitations on the concomitant grant of judicial review. As explained above, *see supra*, Part I.A, some discretionary agency actions are not subject to judicial review. And allowing such review under the cover of an *ultra vires* claim would upend both the statutory framework of the APA and the underlying constitutional structures on which judicial review of executive-department action is based.

### B. The County's Argument Improperly Takes the Form of the Relief it Seeks as the Basis for Establishing Jurisdiction Over the Substance of its Claim.

The County asserts that, because it seeks a prospective injunction to halt future payments of money, it need not worry about the interaction of the common

law and the APA in establishing Texas law governing judicial review of executive-department action. This approaches focuses on one tree. It misses the forest.

A lawsuit does not become a proper subject of *ultra vires* proceedings merely because it involves a request to enjoin the expenditure of money; rather, an injunction requiring future payments of money is an appropriate remedy in a proper *ultra vires* claim. *See Heinrich*, 284 S.W.3d at 377-78. The jurisdictional question is whether the petition describes an act outside the defendant official's discretion. The defendants in this case had discretion to adopt the administrative rules, and those rules are subject to review under § 2001.038. It does not become proper to sidestep the APA's requirements, or to challenge the substance of an already final administrative determination, merely because the form of the remedy is appropriate: exceptions to immunity depend on the substance of the question asked, not the form of the relief requested. *See, e.g.*, *Livingston v. Beeman*, 408 S.W.3d 566, 573 (Tex. App.—Austin 2013, pet. granted) (immunity bars suits to control state action in any form, and suits to require payment of money are a subset of this bar).

## C. The County's Reliance on Extrinsic Evidence Would Lead to a Constitutionally Defective System of Administrative Rule.

If the Court adopted the County's position and allowed a suit to challenge the allocation based on information not found in the applications, the resulting proceeding would violate the Texas Constitution by allowing a court to review an administrative agency's actions based on an extrinsic record.

1. **The County seeks to invalidate the allocation based on extrinsic evidence.**

While the County focuses on the acceptance of the applications as the allegedly *ultra vires* act, much of its argument is tied up with showing that, as a matter of judicially-determined fact, at least some counties are not "affected by" oil-and-gas production. Thus, the County not only tries to sidestep the bar on judicial review, it also seeks a judicial determination that would not be available in judicial review.

2. **Even a statutory judicial-review mechanism based on this type of evidentiary inquiry would violate the Texas Constitution.**

This type of judicial review, in which a court recreates an administrative determination using a new record made before it, has been repeatedly rejected by the Texas Supreme Court as inconsistent with Article II, § I of the Texas Constitution. *E.g.*, *Davis v. City of Lubbock*, 160 Tex. 38, 59-60, 326 S.W.2d 699, 714 (1959);

The APA has been framed to respect this limit. The touchstone of this inquiry is that the court rules on the reasonableness of the body's order, not its correctness. *E.g.*, *Charter Med.-Dallas*, 665 S.W.2d at 452. Thus, the Court has struck down statutes requiring more than substantial-evidence review as constituting an overreach of judicial authority. *Davis*, 160 Tex. at 59-60, 326 S.W.2d at 714; *Fire Dep't of Fort Worth*, 147 Tex. at 509-510 217 S.W.2d at 666 (statute requiring trial *de novo* is unconstitutional unless construed to require substantial-evidence review based on new record made in trial court); *but see Key W. Life Ins. Co. v. State Bd. of*

*Ins.*, 163 Tex. 11, 26, 350 S.W.2d 839, 849-850 (1961) (allowing *de novo* review when issue was one otherwise entrusted to courts).[16]

Section 2001.038's mechanism for review of administrative rules conforms to the limited nature of judicial review of executive-department action provided by the Legislature. A § 2001.038 declaratory-judgment action is directed at the rule generally and cannot be used to address the outcome of a particular dispute. *E.g.*, *Friends of Canyon Lake, Inc. v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 529 (Tex. App.—Austin 2002, pet. denied) (recognizing that a § 2001.038 claim could not revive a defaulted suit for judicial review). It can result only in a determination whether the rule is "valid" or "applicable," and a plaintiff must adequately plead one of those two claims to invoke its provisions. *See City of Webster*, 311 S.W.3d at 100. The cause of action provided by § 2001.038 is the sole mechanism for articulating any claim that an administrative rule is outside an entity's authority, because without its provisions there would be no procedural mechanism to challenge the rule on that type of ground.

---

[16] *Davis* and *Fire Department of City of Fort Worth* rely on the separation of powers and do not discuss Article I, § 28, but the suspension-of-laws prohibition equally supports their holdings, as it does the other cases in which the Court has held that too broad a role for the courts in the administrative review process violates the Constitution. *E.g.*, *S. Canal Co. v. State Bd. of Water Eng'rs*, 159 Tex. 227, 232-34, 318 S.W.2d 619, 622-24 (1958) (striking down a statute because of standard of review*); Gerst v. Nixon*, 411 S.W.2d 350, 354 (Tex. 1967) (striking down statute allowing court to determine the public good by preponderance of the evidence); *Chem. Bank & Trust Co. v. Falkner*, 369 S.W.2d 427, 432-33 (Tex. 1963) (striking down statute allowing *de novo* review of quasi-legislative determination); *see also* George D. Braden, *et. al*, THE CONSTITUTION OF THE STATE OF TEXAS; AN ANNOTATED AND COMPARATIVE ANALYSIS, vol. 1, at 93-94 (1977).

**D.    While the County Would Be Entitled to Raise its Legal Arguments in a Properly-Pleaded § 2001.038 Claim, There is No Proper § 2001.038 Claim in this Appeal.**

As explained above, the proper forum for the County's legal arguments is a § 2001.038 claim. That is not an issue based on the live petition, which does not even attempt to meet the elements of a § 2001.038 claim. The Court should affirm the dismissal in this case, because while those arguments might be brought in a § 2001.038 claim, that is not the claim, nor the form of relief, that the County currently seeks.

**1.    Section 2001.038 is a waiver of sovereign immunity and must be so construed.**

Section 2001.038 provides:

**Declaratory Judgment**

(a) The validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

\* \* \*

(c) The state agency must be made a party to the action.

TEX. GOV'T CODE § 2001.038. It is a waiver of immunity from suit. *E.g.*, *Slay*, 351 S.W.3d at 544-45 ; *see also Tex. Logos, L.P. v. Tex. Dep't of Transp.*, 241 S.W.3d 105, 123 (Tex. App.—Austin 2007, no pet.) (holding that § 2001.038 "is a grant of original jurisdiction and, moreover, waives sovereign immunity").

The scope of the cause of action described in a statutory waiver of immunity defines the scope of the lawsuit that may be brought. *E.g.*, *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584-85 (Tex. 1996). The scope of the waiver must be based on plain text, with any ambiguity resolved in favor of retaining immunity. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003); Tex. Gov't Code § 311.034.

Plain text makes this case straightforward. First, while the cause of action encompasses all challenges to the legal validity of a rule, it requires that they be brought in the form of "an action for declaratory judgment." The APA contains no mention of injunctive relief. Second, an agency must be joined to the lawsuit. This requirement makes the cause of action something other than a background suit for *ultra vires* relief, which serves the more limited purpose of enjoining illegal executive-department activity. Third, any claim must be tied to a "right or privilege." The scope of a plaintiff's suit is thus circumscribed by text—an interested third party, or one who is merely injured but has no "right" or "privilege," cannot institute suit.

Section 2001.038's scope is limited "solely to the extent of permitting suits against state agencies for declaratory relief concerning the validity or applicability of their rules." *Tex. Health & Human Servs. Comm'n v. El Paso Cnty. Hosp. Dist.*, 351 S.W.3d 460, 487 (Tex. App.—Austin 2011), *aff'd* 400 S.W.3d 72 (Tex. 2013). "Validity" challenges extend to any substantive or procedural challenge that would deprive a rule of legal effect. *City Pub. Serv. Bd. of San Antonio v. Pub. Util. Comm'n*,

96 S.W.3d 355, 359 (Tex. App.—Austin 2002, no pet.). Thus, the plain text of § 2001.038 encompasses *all* claims that an administrative rule is invalid by operation of statute, even though purely constitutional claims can be brought outside of its requirements.

### 2. The County's petition does not identify a "rule."

To fall within the waiver of immunity, a plaintiff must identify a "rule" to be challenged. TEX. GOV'T CODE § 2001.038(a). Failure to identify a specific statement that meets the APA's statutory definition of a "rule" is a jurisdictional defect. *City of Webster*, 311 S.W.3d at 100-01. The live petition in this case does not identify a particular rule; rather, it conditionally seeks § 2001.038 relief regarding "any TxDOT rules . . . to the extent that they depart from the statute"). CR.272; *see also* Appellant's Brief at ix (describing § 2001.038 claim as "contingent").

Referring to "any rules" does not identify "a" rule. Moreover, as explained above, §2001.038 is not a waiver of immunity for the construction of administrative rules. It is a cause of action that potentially strikes down the rule as invalid or prohibits its application to a particular set of facts. It is not a general grant of authority to perform administrative decision-making on behalf of a defendant administrative agency.

### 3. The County's petition does not articulate a "right or privilege" necessary to establish standing or a waiver of immunity.[17]

The County's interest in the applications was not that of a program participant, which has at least some expectation of funding that could, depending on the governing law, be vested in nature. Rather, it was a prospective applicant for funding from a program subject to an allocation process.

The only "right or privilege" referenced in the live petition is the prospect of the County's request for money being "underfunded relative to what the statute commands." CR.154. There is no other articulation of a "right or privilege." This interest, however, is not tied to the actual legal complaints on which the County tries to establish jurisdiction, all of which have to do with the acceptance of the applications. *See supra*, Part I.B. The only way for the grant to be "underfunded" under SB 1747, would be for the Department to refuse to apply the allocation formula

---

[17] The Department notes its disagreement with the Court's suggestion in an earlier case that § 2001.038's waiver of immunity extends to any claim for which there is constitutional standing, *Tex. Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 741 (Tex. App.—Austin 2014, pet. filed), which is at odds with its previous announcements that failure to identify a right or privilege is a bar to suit, *see Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 906 (Tex. App.—Austin 2009, no pet.) (plaintiffs who had no "privilege" could not pursue suit); *State v. BP Amer. Prod. Co.*, 290 S.W.3d 345, 363 (Tex. App.—Austin 2009, pet. denied) (narrowly construing provision's immunity waiver to bar suit to determine title as predicate to bringing suit based on privilege, and dismissing for failure to establish privilege). That issue is not directly raised here, because the County's reliance on its entitlement to a particular amount of funding constitutes a pleading defect under either standard.

to counties whose applications are formally complete. The County does not so allege.[18]

To be sure, pleading omissions can usually be cured on remand. But remand would be inappropriate in this case, because the County should have brought an *entirely different* lawsuit. The proper mechanism to bring its claims is a suit for a declaration that the rule is inconsistent with the text of SB 1747, the result of which would control future allocations. Rather than remanding, the Court should render judgment of dismissal and note that the County can seek different relief under a different legal theory in a different lawsuit.

### 4. Even if the County's jurisdictional views were correct, its claim necessarily fails.

The County embraces the idea that, if it can demonstrate that the ultimate result of the allocation violates judicial interpretation of SB 1747, it is appropriate to impose a judicial order attacking the underlying administrative determinations, including the acceptance of the applications. Even assuming that were so—and it is not because allowing such suits would ignore the common law and gut the APA— the County would lose under its own theory. The use of the word "increased" in § 256.103(a) cannot render the words "affected by" in the same provision a nullity,

---

[18] In the trial court, the County also suggested that there is general authority to challenge implementation of a rule under § 2001.038. That argument is foreclosed by precedent. *Guadalupe-Blanco*, 96 S.W.3d at 529.

nor can it wipe away the remainder of SB 1747, which both contemplates awards of funding based on a metric not directly related to oil-and-gas production and suggests that if anyone is to make an "affected by" determination, it is the counties. *See supra*, Part I.C.1. Because the result is not foreclosed by statute, it cannot be a jurisdictional basis for challenging the procedure that produced it.

\* \* \*

The County emphasizes that its view of SB 1747 is, at least, a reasonable one. Appellant's Br. at 28-29. But that point sinks the County's battleship. There are often multiple reasonable readings of a statute. The administrative process is designed so that executive-department entities get to choose between reasonable alternatives. Structurally, that means that the mechanisms for judicial review are designed to prohibit the courts from addressing statutory constructions in the abstract, thereby depriving agencies of discretion. The County's lawsuit seeks to sidestep those procedural requirements and, by extension, the substantive principles they protect. Its lawsuit should be dismissed.

## III. THE COURT SHOULD NOT ISSUE AN APPELLATE INJUNCTION.

The County's request for an appellate injunction fails because (1) it improperly presumes that it is possible to enjoin the dispersal of funds while the administrative rules remain unchallenged; and (2) there is no precedent to hold a state-wide funding program hostage to one county's complaint that it should have received more money.

The County argues that an injunction is appropriate because the corpus of the $225 million will be disbursed under the allocation. But the administrative rules governing unexpended funds, which the County does not challenge are clear. Any excess funding must be reallocated through the entire process, and is not subject to disbursement under the current allocation. 43 TEX. ADMIN CODE § 15.186(a). And if a project comes in under budget, a county may use the unexpended balance for only a one year period. 43 TEX. ADMIN. CODE § 15.194. The County's suggestion that an injunction is appropriate because it would impact each subsequent disbursement of money for particular projects ignores that (1) it is the initial allocation that controls the amount of funding available; (2) if there is too much money allocated, there must be a new allocation; and (3) if projects come in under budget, there are time limits on using the money. In short, the real substance of the County's claim is retrospective in nature because it seeks to go back and undo the predicate administrative action on which subsequent disbursements are based. As a result, there is to enjoin. And a retrospective order is not only barred by immunity, *see supra*, Part I.A.1, but it violates the principles governing writs of appellate injunction, which must be based on a current, enforceable right, not the ultimate litigation outcome sought by the plaintiff, *see Mote Res. Inc. v. RR Comm'n*, 618 S.W.2d 877, 879 (Tex. Civ. App.—Austin 1981, no writ) (distinguishing between current state of affairs and ultimate relief requested).

Appellate injunction extends only to orders that protect appellate jurisdiction. TEX. CONST. art. V §6(a); *e.g.*, *Madison v. Martinez*, 42 S.W.2d 84, 86 (Tex. Civ. App.—Dallas 1931, writ ref'd). The burden is restrictive, far more than required to preserve the status quo ante in a temporary injunction. *See Baird v. Sam Houston Elec. Coop*, 627 S.W.2d 732, 733-34 (Tex. App.—Houston [1st Dist.] 1981) (orig. proceeding) (per curiam). The Court lacks authority to issue the writ merely to preserve the parties from harm pending appeal. *Id.*

The County cannot meet its burden. In *Mote Resources*, for example, the property right already existed and would have been extinguished by court action prior to final judgment. But in this case, the County's participation in the program is not destroyed by disbursements from the fund. The request for an injunction improperly seeks the judgment the County wants, rather than preserving a legal right the County already has.[19]

---

[19] The County points to the policy discussion in the Texas Supreme Court's most recent decision on governmental supersedeas to suggest that any temporary relief would have been meaningless. Appellant's Br. at 35 n.10 (citing *In re State Board for Educator Certification*, No. 13-0537, 2014 WL 7204548 (Tex. Dec. 19, 2014) (orig. proceeding)). That assertion misses the point: while temporary relief may be available in some instances, it remains the case that the appellant is required to assume the financial risk inherent in leaving the judgment in place, *see* TEX. R. APP. P. 24.2(a)(3). It is unclear that a single plaintiff could necessarily propose a sufficient bond to address the financial problems inherent in delaying a state wide road-funding measure through the entire appellate process.

**PRAYER**

The Court should affirm the trial court's judgment.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT A. KELLER
Solicitor General

 /s/ Kristofer S. Monson
KRISTOFER S. MONSON
Assistant Solicitor General
State Bar No. 24037129
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1820
Fax: (512) 474-2697
*kristofer.monson@texasattorneygeneral.gov*

COUNSEL FOR APPELLEES

**CERTIFICATE OF SERVICE**

On February 20, 2015, this brief was served via File & ServeXpress on:

Don Cruse
Law Office of Don Cruse
1108 Lavaca St., #110-436
Austin, Texas 78701
*don.cruse@texasappellate.com*

COUNSEL FOR APPELLATE

/s/ Kristofer S. Monson
Kristofer S. Monson

**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 10,412 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

/s/ Kristofer S. Monson
Kristofer S. Monson

# Appendix

# Table of Contents

Legislative History Transcriptions.................................................................A

Relevant Provisions of SB 1747 ...................................................................... B

A

# SB 1747 – LEGISLATIVE HISTORY TRANSCRIPTIONS
# 83d Leg., R.S.

| Date | Committee | Time | Speaker | Transcription |
|---|---|---|---|---|
| 04/10/13 | Senate Comm. on Transportation | 01:35:44 | Sen. Carlos Uresti | "While today I highlight the explosive growth of the Eagle Ford Shale as an example of why this Bill is needed, it will not only apply to the Eagle Ford Shale. Based on the matrix in this Bill nearly every county could stand to benefit including those in the Barnett Shale, the Permian Basin, or future plays such as the Eaglebine or Cline. Senate Bill 1747 is a result of numerous meetings and compromise with county and local government officials, oil and gas industry representatives, various groups and associations, and state agencies, in an attempt to infuse resources to help address the degradation of the transportation infrastructure associated with the oil and gas activities. Members, generally Senate Bill 1747 would provide a funding mechanism that will allow counties to qualify for immediate funds from the grant program. Funds would be distributed based on the number of well completions, the number of weight tolerance permits, and the taxes collected from production for each county." |
| 05/08/13 | House Comm. on Energy Resources | 00:49:24 | La Salle County Judge Joel Rodriguez, Jr. | "I'm concerned about the time line in reference to setting it up. The time line because you have 254 counties that have to set up and to comply with your issues on your reports and projects and things that are needed." |
| 05/06/14 | House Select Comm. on Transportation Funding | 05:46:19 | TxDOT Representative | "I was kind of surprised that my county was being included in any type of money coming from this when that's not what I thought when it was presented before the Legislature; surely not afterwards .... how it was rolled out was a little different than I expected." |

AFFIDAVIT OF MICHELLE BLASKOVICH

| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

"My name is Michelle Blaskovich. I am a Legal Assistant with the Office of Attorney General, Solicitor General's Office. I am over the age of eighteen (18) years and fully competent to testify herein. The facts stated herein are within my personal and professional knowledge and are true and correct.

"Attached is a series of excerpts of debates held on the floor of the Texas House and Senate in April and May of 2013, relating to Senate Bill 1747 (83R). Using the personal computer in my office, I obtained these items by accessing the video archives of the Texas Legislative Council. I listened to the aforementioned proceedings, at my computer, and using my computer, transcribed the proceedings. The attached excerpts are a true and accurate rendition of the aforementioned debates that I transcribed to the best of my ability.

"I have read the above and foregoing Affidavit, consisting of this and the attachment, and swear that it is true and correct.

"FURTHER AFFIANT SAITH NOT."

_____ BPM
Michelle Blaskovich, Affiant

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this 20th day of February, 2015.

_____
Notary Public, State of Texas

CECILIA ANN HERTEL
Notary Public
STATE OF TEXAS
Commission Exp. OCT. 02, 2018

**Notary without Bond**

B

# Relevant Provisions of SB 1747

§ 256.103. Grant Program

(a)    The department shall develop policies and procedures to administer a grant program under this subchapter to make grants to counties for transportation infrastructure projects located in areas of the state affected by increased oil and gas production. The department may adopt rules to implement this subchapter.

(b)    Grants distributed during a fiscal year must be allocated among counties as follows:

    (1)    20 percent according to weight tolerance permits, determined by the ratio of weight tolerance permits issued in the preceding fiscal year for the county that designated a county energy transportation reinvestment zone to the total number of weight tolerance permits issued in the state in that fiscal year, as determined by the Texas Department of Motor Vehicles;

    (2)    20 percent according to oil and gas production taxes, determined by the ratio of oil and gas production taxes collected by the comptroller in the preceding fiscal year in the county that designated a county energy transportation reinvestment zone to the total amount of oil and gas production taxes collected in the state in that fiscal year, as determined by the comptroller;

    (3)    50 percent according to well completions, determined by the ratio of well completions in the preceding fiscal year in the county that designated a county energy transportation reinvestment zone to the total number of well completions in the state in that fiscal year, as determined by the Railroad Commission of Texas; and

    (4)    10 percent according to the volume of oil and gas waste injected, determined by the ratio of the volume of oil and gas waste injected in the preceding fiscal year in the county that designated a county energy transportation reinvestment zone to the total volume of oil and gas waste injected in the state in that fiscal year, as determined by the Railroad Commission of Texas.

**§ 256.104. Grant Application Process**

(a)    In applying for a grant under this subchapter, the county shall:

    (1)    provide the road condition report described by Section 251.018 made by the county for the previous year; and

    (2)    submit to the department:

    (A)    a copy of the order or resolution establishing a county energy transportation reinvestment zone in the county, except that the department may waive the submission until the time the grant is awarded; and

    (B)    a plan that:

        (i)    provides a list of transportation infrastructure projects to be funded by the grant;

        (ii)    describes the scope of the transportation infrastructure project or projects to be funded by the grant using best practices for prioritizing the projects;

        (iii)    provides for matching funds as required by Section 256.105; and

        (iv)    meets any other requirements imposed by the department.

(b)    In reviewing grant applications under this subchapter, the department shall:

    (1)    seek other potential sources of funding to maximize resources available for the transportation infrastructure projects to be funded by grants under this subchapter; and

    (2)    consult related transportation planning documents to improve project efficiency and work effectively in partnership with counties.

(c)    Except as otherwise provided by this subsection, the department shall review a grant application before the 31st day after the date the department receives the application. The department may act on an application not later than the 60th day after the date the department receives the application if the department provides notice of the extension to the county that submitted the application.

§ 222.1071. County Energy Transportation Reinvestment Zones

(a)    A county shall determine the amount of the tax increment for a county energy transportation reinvestment zone in the same manner the county would determine the tax increment as provided in Section 222.107(a) for a county transportation reinvestment zone.

(b)    A county, after determining that an area is affected because of oil and gas exploration and production activities and would benefit from funding under Chapter 256, by order or resolution of the commissioners court:

    (1)    may designate a contiguous geographic area in the jurisdiction of the county to be a county energy transportation reinvestment zone to promote one or more transportation infrastructure projects, as that term is defined by Section 256.101, located in the zone; and

    (2)    may jointly administer a county energy transportation reinvestment zone with a contiguous county energy transportation reinvestment zone formed by another county.

(c)    A commissioners court must:

    (1)    dedicate or pledge all of the captured appraised value of real property located in the county energy transportation reinvestment zone to transportation infrastructure projects; and

    (2)    comply with all applicable laws in the application of this chapter.

(d)    Not later than the 30th day before the date a commissioners court proposes to designate an area as a county energy transportation reinvestment zone under this section, the commissioners court must hold a public hearing on the creation of the zone and its benefits to the county and to property in the proposed zone. At the hearing an interested person may speak for or against the designation of the zone, its boundaries, the joint administration of a zone in another county, or the use of tax increment paid into the tax increment account.

(e)    Not later than the seventh day before the date of the hearing, notice of the hearing and the intent to create a zone must be published in a newspaper having general circulation in the county.

(f)    The order or resolution designating an area as a county energy transportation reinvestment zone must:

    (1)    describe the boundaries of the zone with sufficient definiteness to identify with ordinary and reasonable certainty the territory included in the zone;

    (2)    provide that the zone takes effect immediately on adoption of the order or resolution designating an area and that the base year shall be the year of passage of the order or resolution designating an area or some year in the future;

    (3)    establish an ad valorem tax increment account for the zone or provide for the establishment of a joint ad valorem tax increment account, if applicable; and

    (4)    if two or more counties are designating a zone for the same transportation infrastructure project or projects, include a finding that:

        (A)    the project or projects will benefit the property and residents located in the zone;
        (B)    the creation of the zone will serve a public purpose of the county; and
        (C)    details the transportation infrastructure projects for which each county is responsible.

(g)    Compliance with the requirements of this section constitutes designation of an area as a county energy transportation reinvestment zone without further hearings or other procedural requirements.

(h)    The county may, from taxes collected on property in a zone, pay into a tax increment account for the zone or zones an amount equal to the tax increment produced by the county less any amounts allocated under

previous agreements, including agreements under Section 381.004 Local Government Code, or Chapter 312, Tax Code.

(i)     The county may:

    (1)     use money in the tax increment account to provide:

        (A)     matching funds under Section 256.105; and
        (B)     funding for one or more transportation infrastructure projects located in the zone;

    (2)     apply for grants under Subchapter C, Chapter 256, subject to Section 222.1072;

    (3)     use five percent of any grant distributed to the county under Subchapter C, Chapter 256, for the administration of a county energy transportation reinvestment zone, not to exceed $250,000;

    (4)     enter into an agreement to provide for the joint administration of county energy transportation reinvestment zones if the commissioners court of the county has designated a county energy transportation reinvestment zone under this section for the same transportation infrastructure project or projects as another county commissioners court; and

    (5)     pledge money in the tax increment account to a road utility district formed as provided by Subsection (n).

(j)     Tax increment paid into a tax increment account may not be pledged as security for bonded indebtedness.

(k)     A county energy transportation reinvestment zone terminates on December 31 of the 10th year after the year the zone was designated unless extended by an act of the county commissioners court that designated the zone. The extension may not exceed five years. On termination of the zone, any money remaining in the tax increment account must be transferred to the road and bridge fund described by Chapter 256 for the county that deposited the money into the tax increment account.

(l)     The captured appraised value of real property located in a county energy transportation reinvestment zone shall be treated as provided by Section 26.03 Tax Code.

(m)     The commissioners court of a county may enter into an agreement with the department to designate a county energy transportation reinvestment zone under this section for a specified transportation infrastructure project involving a state highway located in the proposed zone.

(n)     In the alternative, to assist the county in developing a transportation infrastructure project, if authorized by the commission under Chapter 441, a road utility district may be formed under that chapter that has the same boundaries as a county energy transportation reinvestment zone created under this section. The road utility district may issue bonds to pay all or part of the cost of a transportation infrastructure project and may pledge and assign all or a specified amount of money in the tax increment account to secure those bonds if the county:

(1)     collects a tax increment; and
(2)     pledges all or a specified amount of the tax increment to the road utility district.

(o)     A road utility district formed as provided by Subsection (n) may enter into an agreement to fund development of a transportation infrastructure project or to repay funds owed to the department. Any amount paid for this purpose is considered to be an operating expense of the district. Any taxes collected by the district that are not paid for this purpose may be used for any district purpose.